RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 16a0061p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

AMY SUE WITHAM,

　　　　　　　　*Plaintiff-Appellant,*

*v.*

INTOWN SUITES LOUISVILLE NORTHEAST, LLC,

　　　　　　　　*Defendant-Appellee.*

No. 15-5734

---

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 3:13-cv-01167—David J. Hale, District Judge.

Decided and Filed:  March 10, 2016

Before:  MERRITT, GIBBONS, and SUTTON, Circuit Judges.

---

**ON BRIEF:**  Daniel J. Canon, L. Joe Dunman, CLAY DANIEL WALTON & ADAMS, PLC, Louisville, Kentucky, for Appellant.  Marcia L. Pearson, Edward M. O'Brien, WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP, Louisville, Kentucky, for Appellee.

---

**OPINION**

---

SUTTON, Circuit Judge.  Amy Witham claims she was fired from her position as a hotel general manager because she sought workers' compensation after sustaining injuries on the job. The hotel claims it fired her because she engaged in a heated verbal exchange, followed by a physical confrontation, with someone who walked into the lobby.  Happily for us (and unhappily for Witham), we have video footage of the incident that validates the company's version of what happened.  We affirm the district court's grant of summary judgment to the hotel.

1

On November 19, 2012, Witham reported to her job at Intown Suites in Louisville, Kentucky. Around 11:30 AM, she was standing at the front desk, talking to two men, while a manager in training milled about nearby. Two security cameras recorded what happened during the next few minutes.

A man entered the lobby and sidled up to the counter in front of Witham. The vending machine outside the lobby, he complained, had returned a bottle of water when he had pushed the button for a can of root beer. Witham inquired about the man's room number, but he said he was not staying at the hotel. "Just a head's up, that's for guests only," Witham replied. "You could actually get ticketed for trespassing by the police if you're over here and you're not a tenant, just so you know." R. 14-3 at 11:25:12–:20. She said she would pass along his complaint to the vending machine's operators.

After pausing for a few seconds, the man murmured something inaudible (but evidently inflammatory), to which Witham responded, "Well, you're not a tenant here, so you're not gonna talk like that in my office, and you can go ahead and leave." *Id.* at 11:25:39–:43. Witham and the man began shouting over each other, and she asked him to leave a few more times. Then she said "bye" sarcastically and made an exaggerated waving gesture—a gesture she repeated twice more as the man approached the door to leave. *Id.* at 11:25:53–:54. He said something about how "lucky" Witham was that he had not come across the counter after her. *Id.* at 11:25:58–:26:01. Witham dared him to do just that. "Come across the counter, cause it's on camera now, honey," she taunted, pointing to the lobby's security camera. *Id.* at 11:26:00–:04.

The man came back toward Witham, and they both began yelling as he approached. He raised himself up onto the front desk, kneeling on the counter that separated Witham from the lobby. He said he would "f[***] [Witham] up" and called her a "bitch." *Id.* at 11:26:07–:15. All the while, Witham continued to egg him on, pointing to her chest and daring him to join her across the counter. He knocked her computer monitor to the ground, and she ordered the manager in training to "call 9-1-1 right now." *Id.* at 11:26:18–:19.

Witham left her perch behind the desk, marched to the front door, and stood directly in front of it, blocking the man from exiting. He tried to tug the door open, but Witham jammed it

back shut.  Then he pushed Witham into the wall, and she charged back toward him, swatting and clawing at his face.  They tussled for a few seconds, and the man slammed Witham to the floor, kicked her twice, flung open the door, and fled—leaving the match that lit this conflagration (an unwanted bottle of water) behind.

The man ran into Edward Lucas, another hotel employee, just outside the building.  Witham followed from the lobby, telling Lucas to "bring him in here," but the man continued to flee.  *Id.* at 11:26:44–:46.  Witham returned to the hotel a few minutes later, collected her phone, and went to the hospital to obtain treatment for injuries to her head and hand that had occurred during the fight.

A day or two after the confrontation, Intown's general counsel and its chief executive officer viewed the security footage of the incident.  They discussed the video with two other executives, and, after everyone agreed that Witham had acted unprofessionally, they placed her on administrative leave.

A few days later, after the intervening Thanksgiving weekend, Witham called Intown's benefits department to obtain a workers' compensation claim number, and Intown set up Witham's claim.  That same day, the four executives who had placed Witham on leave reconvened, and they unanimously decided to fire her for her conduct during the altercation.

Witham filed this lawsuit in a Kentucky court, claiming that Intown had violated state law by discharging her in retaliation for filing a workers' compensation claim.  Intown removed the case to federal court based on the parties' diverse citizenship, and filed a motion for summary judgment, which the district court granted in a thoughtful opinion.  *Witham v. Intown Suites Louisville N.E., LLC*, No. 3:13-CV-1167, 2015 WL 3646802, at *7 (W.D. Ky. June 10, 2015).  Witham appealed.

"No employee," Kentucky law provides, "shall be harassed, coerced, discharged, or discriminated against in any manner whatsoever for filing and pursuing a lawful claim under [the workers' compensation] chapter."  Ky. Rev. Stat. § 342.197(1).  To establish a claim under this provision, an employee must show that (1) she participated in "a protected activity," (2) the employer "knew" that the employee had done so, (3) the employer took an "adverse employment

action" against the employee, and (4) "a causal connection" existed between the two. *Dollar Gen. Partners v. Upchurch*, 214 S.W.3d 910, 915 (Ky. Ct. App. 2006). If the employee meets these requirements, the employer must identify "a non-retaliatory reason for the adverse employment decision." *Id.* at 916. And if the employer makes this showing, the employee may still succeed by showing the proffered reasons were nothing but "a pretext" for retaliation. *Id.* (quotation omitted). Through it all, the employee retains the ultimate burden to persuade the jury "that the workers' compensation claim was 'a substantial and motivating factor but for which the employee would not have been discharged.'" *First Prop. Mgmt. v. Zarebidaki*, 867 S.W.2d 185, 188 (Ky. 1993).

Gauged by this standard, Witham's retaliation claim fails. Even if she could establish the first requirements of a claim, she cannot show that Intown's explanations for discharging her—supported by the video—amounted to pretext. Intown's general counsel stated that the company fired Witham because her behavior in the video was neither "professional [n]or necessary under the circumstances." R. 18-1 at 19. By encouraging the man to jump onto her desk and by preventing him from leaving, Witham transformed a minor incident over a wrongly dispensed water bottle into a tense conversation and eventually into a physical confrontation, violating a number of company policies along the way. And she did all of this in front of another employee whom she was supposed to be *training*. The security footage bears out the hotel's version of events, confirming Witham's belligerent and unsafe conduct. Intown's general counsel stated that this conduct was the *only* factor that went into the decision to fire Witham, noting that the executives never so much as mentioned her workers' compensation claim. There is nothing to rebut this evidence, making it difficult to say that retaliation played *any* role—let alone a "substantial and motivating" one—in her firing. *Bishop v. Manpower, Inc. of Cent. Ky.*, 211 S.W.3d 71, 76 (Ky. Ct. App. 2006).

Seeking to fend off this conclusion, Witham points to some facts that purportedly show that Intown's explanation for her discharge was pretextual. She notes that, of the four executives who decided to fire her, two were aware that she sought medical treatment, and the other two were aware of the altercation itself—which means they knew she was eligible for workers' compensation. The executives, she adds, viewed the security footage a day or two after the

incident, but they did not fire Witham until a week later, on the same day she inquired about her workers' compensation claim. That behavior becomes even more suspicious, Witham continues, when one considers that they fired her without a warning despite her spotless disciplinary record. If that is not enough, she finishes, Intown employee Edward Lucas "tackled" the man who wanted some root beer after he exited the building and yet the company did not fire (or even discipline) Lucas for his conduct. Appellant's Br. 27.

Taken together or apart, these facts do not cast doubt on Intown's explanation for firing Witham or more to the point create a material triable issue of fact for a jury. That the executives *knew* Witham had a workers' compensation claim does not mean they discharged her *because of* that claim. Otherwise, every plaintiff who established a prima facie case—which includes a showing that the defendant knew the plaintiff engaged in protected activity—would necessarily satisfy the pretext inquiry. *See Dollar Gen.*, 214 S.W.3d at 915–16. That does not respect the burden-shifting framework for retaliation claims used by Kentucky law or for that matter federal law. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509–11 (1993). The only relevant testimony in the record, which comes from Intown's general counsel, indicates that the executives *did not* consider the workers' compensation claim when they fired Witham.

Nor does the delay in the company's decision-making process create an inference of retaliation. When the executives viewed the security footage a day or two after the incident, they immediately placed Witham on administrative leave, establishing their concern about her conduct from the get-go. They then left for a long holiday weekend, and they fired her when they returned on Monday. Companies need not rashly discharge an employee at the first sign of trouble to prove the sincerity of their motives, and Intown's minimal delay does nothing to undermine its explanation for firing Witham.

Nor does it matter that Intown discharged Witham instead of disciplining her by using less severe measures. The company's employee handbook states that "there are clearly serious infractions that are cause for immediate termination," R. 21-1 at 3, and Witham's conduct during the confrontation readily qualifies.

Nor does the video footage indicate that Lucas "tackled the intruder," as Witham asserts. Appellant's Br. 27. It appears instead that the fleeing man *ran into* Lucas or at best that Lucas grabbed him when he came through the door. But even if Witham's characterization is accurate, Intown's decision to fire an employee who *escalated* the conflict—while sparing an employee who intervened at the last minute—does not suggest that its motives were retaliatory. A jury considering these facts could not conclude that Witham's workers' compensation claim contributed, let alone substantially contributed, to her firing.

Unable to muster her own evidence establishing a genuine dispute of material fact, Witham argues that the *company's* evidence requires this case to reach a jury. She begins by pointing to the general counsel's testimony about the reasons for Witham's firing, arguing that a jury should hear this testimony to assess its credibility. Then she sets her sights on the video footage, noting that it "is subject to multiple reasonable interpretations" and that a jury should be permitted to draw its own conclusions. *Id.* at 26.

Witham's argument mistakes Civil Rule 56 for Civil Rule 12. If we were hearing this case at the motion-to-dismiss stage, we would credit Witham's plausible factual allegations, even if Intown contested them, and reject a Civil Rule 12(b)(6) motion. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007). But at the summary judgment phase, there must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Witham may not point to the bare possibility that a jury might *disbelieve* the general counsel's testimony; she must present proof of her own that creates a "genuine dispute as to any material fact." Fed. R. Civ. P. 56(a); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986). So too, it does not suffice to argue that the jury might interpret the video differently without offering a plausible alternative interpretation. The footage shows Witham arguing with (then physically sparring with) an interloper in the hotel lobby, and it thus supports the company's explanation for her discharge. We need not deny what our eyes can see through this visual evidence or cede all ground to the jury by suspending belief in our own eyes. We instead must "view[] the facts in the light depicted by the videotape," which is all that the summary judgment standard demands. *Scott v. Harris*, 550 U.S. 372, 381 (2007).

For these reasons, we affirm.